**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4486-15T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ALEXIS CANADAS,

    Defendant-Appellant.

_____

        Submitted September 26, 2017 — Decided July 11, 2018

        Before Judges Carroll and Leone.

        On appeal from Superior Court of New Jersey,
        Law Division, Essex County, Indictment Nos.
        15-02-0231 and 16-01-0056.

        Joseph E. Krakora, Public Defender, attorney
        for appellant (Daniel V. Gautieri, Assistant
        Deputy Public Defender, of counsel and on the
        briefs).

        Robert D. Laurino, Acting Essex County
        Prosecutor, attorney for respondent (Barbara
        A. Rosenkrans, Special Deputy Attorney
        General/Acting Assistant Prosecutor, of
        counsel and on the briefs).

        Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Alexis Canadas was convicted of weapons offenses under two indictments. He appeals his judgments of conviction dated May 20 and May 23, 2016. We affirm his convictions, and remand for the court to vacate his sentences and resentence him.

I.

The trial testimony included the following facts. On the night of August 16, 2014, Detectives Anna Colon and Angel Pared of the Newark Police Department's Firearm Interdiction Team were on patrol with Rutgers University Police Officer Michael Prendeville in an unmarked vehicle. A speeding Acura swerved around them on the right and cut in front of them.

Detective Colon pulled over the Acura for improper passing and failure to signal. Defendant was the driver, and co-defendant Michael Muniz was the passenger.

Detective Colon approached the Acura. Through the open driver's window she saw defendant hunched over and moving his right arm even though his registration and insurance documents were already on his lap. Colon shone her flashlight into the car and saw the handle of a handgun under the driver's seat.

Detective Colon had defendant exit the vehicle. She shouted the police codes for "arrest" and "firearm." Detective Pared had Muniz exit the Acura and handcuffed him. Officer Prendeville handcuffed defendant.

Detective Colon testified that as the defendants were being handcuffed, defendant became upset and started shouting. Colon could not remember "specifically the words that he said," "but he made it known that the gun was his and not his brother's." The court sustained Muniz's objection to the word "brother." Detective Pared testified he did not "remember the specific words that [defendant] said," but he said "[s]omething in th[e] nature" of "that's my gun." Officer Prendeville testified defendant said something which "went to the fact that the gun was his."

A Crime Scene officer came, photographed the gun under the seat, and then removed the handgun, a .40 caliber pistol with a defaced serial number. The gun had a bullet in the chamber and fourteen bullets in the magazine, including two hollow-point bullets. Neither defendant nor Muniz had a permit for the handgun. Defendant had previously been convicted of crimes covered by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2(d).

Indictment No. 15-02-0231 charged defendant and Muniz with second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b); fourth-degree possession of hollow-nose bullets, N.J.S.A. 2C:39-3(f); fourth-degree possession of a defaced firearm, N.J.S.A. 2C:39-3(d); and fourth-degree possession of a large-capacity magazine, N.J.S.A. 2C:39-3(j). Indictment No. 16-01-0056 charged defendant with first-degree unlawful possession of a

handgun by a person with a prior conviction of a NERA crime, N.J.S.A. 2C:39-5(j).

At the trial on Indictment No. 15-02-0231, the court dismissed the magazine charge. The jury convicted defendant of the remaining charges but acquitted Muniz. In a bifurcated trial, the same jury convicted defendant of the charge in Indictment No. 16-01-0056.

Under Indictment No. 15-02-0231, for the second-degree offense, the trial court sentenced defendant to an extended term of eighteen years in prison with nine years of parole ineligibility. The court imposed on each fourth-degree offense a concurrent eighteen-month term. For Indictment No. 16-01-0056's first-degree offense, the court sentenced defendant to an extended term of thirty years in prison, with fifteen years of parole ineligibility, to run concurrently with the sentences under the other indictment.

Defendant appeals, raising the following points:

> POINT I — A NEW TRIAL MUST BE ORDERED BECAUSE, AFTER THE JUDGE SUBSTITUTED A JUROR AND DIRECTED THAT THE JURORS COMMENCE THEIR DELIBERATIONS FROM THE BEGINNING, HE PREVENTED THE POSSIBILITY THAT THE NEWLY RECONSTITUTED JURY COULD COMMENCE ITS DELIBERATIONS ANEW BY THEN PROCEEDING TO PLAYBACK TESTIMONY THAT HAD BEEN REQUESTED BY THE PRIOR JURY. (Not Raised Below).
>
> POINT II — CANADAS WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY TOLD THE JURORS IN SUMMATION THAT THE

A-4486-15T2

STATE'S BURDEN TO PROVE GUILT BEYOND A REASONABLE DOUBT AMOUNTS TO A 75% OR GREATER PROBABILITY OF GUILT. THE COURT DEPRIVED CANADAS OF DUE PROCESS AND A FAIR JURY TRIAL WHEN IT FAILED TO CORRECT THE ERROR, THEREBY LOWERING THE STATE'S BURDEN OF PROOF. (Not Raised Below).

POINT III — THE EXTENDED-TERM SENTENCE IMPOSED FOR POSSESSION OF A HANDGUN BY SOMEONE WHO HAS PREVIOUSLY BEEN CONVICTED OF A NO-EARLY-RELEASE-ACT OFFENSE, N.J.S.A. 2C:39-5j, IS ILLEGAL BECAUSE THE OFFENSE DOES NOT COME WITHIN THE GRAVES ACT.

## II.

Defendant first challenges the trial court's playback of testimony even though an alternate was substituted between the granting of the jury's request for the playback and the playback itself. In the trial on Indictment No. 15-02-0231, after the alternates were sequestered, the jury began its deliberations after lunch. Shortly before 3:40 p.m., after deliberating for what Muniz's counsel later estimated was about three hours, the jury asked three questions. The second question asked: "We, the jury, have a question regarding testimony by several law enforcement officers who heard Alex Canadas's claim that the gun was his and NOT HIS 'BROTHER'S.' May we have this testimony provided to us and/or read back to us?"

The trial court and counsel discussed the questions. It was agreed the court should play back for the jury the testimony by

5

the three officers about defendant's statements.  However, because it would take time to isolate that testimony, it was agreed to send the jury home and resume the next day.  In the presence of the jurors and alternates, the court discussed the jury's questions and its answers, and said of the requested testimony: "come back tomorrow, and then we will have that information.  We will play it back for you."

The next morning, the trial court and counsel reviewed the recordings and isolated the requested testimony.  The court informed counsel that juror #11 was now in the hospital.  The court proposed to replace juror #11 with one of the alternates, to read the Model Jury Charge (Criminal), "Judge's Instructions When Alternate Juror Empaneled After Deliberations Have Begun" (Jan. 14, 2013), and to "play back for the jurors the testimony." Both defense counsel said they had no objection to seating an alternate or giving the instruction.  Both defendant's counsel and Muniz's counsel requested that the court pause the playback to give a curative instruction about the word "brother."

The trial court informed the jury that Juror #11 had been excused, that the alternate had been seated, and that the court would give the jury the requested playback.  The court then gave the reconstituted jury the model instruction, including:

[A]s of this moment, you are a new jury, and you must start your deliberations all over again. The parties have the right to a verdict reached by 12 jurors who have had the full opportunity to deliberate from start to finish. The alternate juror . . . has had no knowledge of your earlier deliberations. Consequently, the new deliberating jury must start over at the very beginning of deliberations. Each member of the original deliberating jury must set aside and disregard whatever may have occurred and anything which may have been said in the jury room following my instructions to you. You must give no weight to any opinion expressed by Juror Number 11 during deliberations before that juror was excused. Together as a new jury you must consider all evidence presented at trial as part of your full and complete deliberations until you reach a verdict.

Then the audio recording of the requested testimony was played once in open court. When the playback referenced the term "brother," the court stopped the tape and instructed the jury that there had been no evidence of a familial relationship and that they should disregard the term. When the playback was over, the court again instructed the jurors that the alternate was "not a part of your discussions yesterday, and that is why you are directed now to start deliberating anew."

The reconstituted jury deliberated for about fifty minutes, got lunch, resumed deliberations, and reached a verdict. Although the time was not recorded, the trial prosecutor estimated the jury returned its verdicts at 3:00 p.m.

On appeal, defendant claims that by allowing the playback requested by the original jury, the trial court deprived defendant of his right to have the seated alternate fully engage in collective and mutual deliberations with the other jurors. However, at trial, defendant did not object to the playback to the reconstituted jury, instead agreeing the playback should be interrupted to address the defense objection to the word "brother."

Defendant must overcome the invited error doctrine. "Under that settled principle of law, trial errors that 'were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal.'" State v. A.R., 213 N.J. 542, 561 (2013) (citation omitted). Defendant's counsel consented to or acquiesced in the playback to the reconstituted jury, asking the playback be interrupted to address the objection to the word "brother." See id. at 563 (finding defense counsel encouraged or '[a]t the very least, consented or acquiesced to" allowing the jury erroneously to playback video-recorded statements in the jury room by saying "[t]hey might be able to look at that"). "Under those circumstances, defendant invited the very error he now considers so egregious to warrant a new trial." Ibid. Moreover, the playback arguably served defendant's strategy in summation of highlighting that the officers could not remember or agree on "exactly what was said,"

and suggesting that the jurors "can ask to have Officer Colon's testimony played back for you." See id. at 562 (rejecting defendant's challenge to a playback in part because defense counsel said the jury "'probably should review the tape again'" of the defendant's confession because it would show he was tired). Accordingly, defendant "is barred from raising an objection for the first time on appeal" about the playback under the invited error doctrine. Id. at 561 (citation omitted). Defendant does not fall within the exception to the doctrine because replaying testimony that was already heard by the jurors, including the alternate, did not "cut mortally" into defendant's rights and did "not constitute a 'fundamental miscarriage of justice.'" Id. at 562 (citation omitted).

Even if the invited error doctrine does not bar defendant's claim, he did not object and thus must show "plain error." R. 2:10-2; see State v. Fortin, 178 N.J. 540, 625 (2004). Under the plain error standard, "defendant has the burden to show that there is an error, that the error is 'clear' or 'obvious,' and that the error has affected 'substantial rights.'" State v. Chew, 150 N.J. 30, 82 (1997) (quoting, and ruling "our law is the same" as, United States v. Olano, 507 U.S. 725, 734 (1993)); see State v. Morton, 155 N.J. 383, 421 (1998). An error is not clear or obvious "unless the error is clear under current law" at the time of appellate

consideration.  <u>Olano</u>, 507 U.S. at 734; <u>see</u> <u>Henderson v. United States</u>, 568 U.S. 266, 279 (2013); <u>Johnson v. United States</u>, 520 U.S. 461, 468 (1997).  To show an effect on substantial rights, defendant has the burden of proving the error was "clearly capable of producing an unjust result[.]"  <u>R.</u> 2:10-2; <u>see</u> <u>State v. Weston</u>, 222 N.J. 277, 294-95 (2015).

Defendant has not shown any of the requirements for plain error.  First, he has not shown the trial court erred in granting the jury's request for a playback.  "Juries routinely ask to review trial testimony when they deliberate.  Absent 'some unusual circumstance,' those requests should be granted."  <u>State v. Miller</u>, 205 N.J. 109, 119-20, 122 (2011) (citation omitted).  "Courts should honor a jury's specific request to hear only limited parts of a witness' testimony — provided . . . that playback includes relevant direct and cross examination."  <u>Id.</u> at 123.  Trial "[c]ourts have broad discretion as to whether and how to conduct read-backs and playbacks."  <u>Id.</u> at 122.  The court's decision is reviewed for "an abuse of discretion."  <u>State v. W.B.</u>, 205 N.J. 588, 623 (2011).

The trial court did not abuse its broad discretion by granting the original jury's request for a playback.  Such "requests are a clear sign that the evidence sought is important to the deliberative process.  They also reflect the reality that jurors

cannot be expected to have perfect recall of every bit of evidence introduced during a trial."  Miller, 205 N.J. at 120.

Nor was it an abuse of discretion, once the trial court had granted the original jury's request for a playback, to do the promised playback after the alternate had been substituted.  An alternate is required to receive the same information as the sitting jury to ensure the alternate will have the same informational foundation if the alternate is later substituted. State v. Miller, 76 N.J. 392, 407 (1978) (ruling "alternate jurors should have been brought into the courtroom to hear [any supplemental] charge"); 32 N.J. Practice, Criminal Practice and Procedure § 20:38, at 561-62 (Leonard N. Arnold) (2018) ("If the deliberating jury has a question, then at the time the question is answered . . . the alternate jurors must be present"). Readbacks and playbacks are part of that informational foundation, and thus should occur in the presence of the alternates even before they are seated as jurors.  Thus, there was no reason not to do the playback once the alternate was seated.  The court was not required to do the playback only for the original jurors and create an unequal foundation, or to refuse the promised playback and deny the jurors important information.

Defendant argues the request for a readback showed the original jury was well-entrenched in the deliberations.  However,

11

our Supreme Court has upheld the substitution of an alternate immediately after a readback, finding "[t]he jury's request for a readback regarding the identification of defendants suggests that the jury had not resolved that critical issue." State v. Williams, 171 N.J. 151, 168-69 (2002) (finding "the precise number of hours and minutes of the prior deliberations are less important because" of the readback, which showed "[t]he jury could not have reached a determination of guilt or innocence"). Applying Williams, the Court has upheld the substitution of an alternate for an ill juror on the fifth day of deliberations after readbacks. State v. Ross, 218 N.J. 130, 138, 152-53 (2014). Here, the jury had deliberated only three hours before the readback request and alternate's substitution, and then deliberated for about the same period before reaching a verdict. See Williams, 171 N.J. at 169 (finding no plain error where "the jury deliberated for a length of time equivalent to that spent in deliberations before the readback").

The facts here bear no resemblance to the cases defendant cites, which held an alternate could not be substituted because the deliberations had gone too far for the alternate to have "a realistic opportunity to share in the deliberative process." Williams, 171 N.J. at 170. Cf. State v. Jenkins, 182 N.J. 112, 132-33 (2004) (citation omitted) (reversing because the colloquy with the discharged juror "strongly suggests that eleven jurors

already had made up their minds to convict defendant"); State v. Corsaro, 107 N.J. 339, 351, 354 (1987) (reversing because the jury had already returned a partial verdict); State v. Williams, 377 N.J. Super. 130, 150 (App. Div. 2005) (reversing because "the jury had been deliberating for approximately twelve hours," had been given the instruction for deadlocked juries, and convicted one hour after the alternate was added).[1]

When an alternate is substituted, the trial court should create "an environment so that the mutual or collective nature of the jury's deliberations is preserved and remains intact until a final determination is reached." Corsaro, 107 N.J. at 349. The court did so by giving the strong model instruction explaining to the reconstituted jury how "you are a new jury, and you must start your deliberations all over again," and by reiterating after the playback that "you are directed now to start deliberating anew." See Ross, 218 N.J. at 140, 147, 151; cf. State v. Trent, 79 N.J. 251, 254-55, 257 (1979) (reversing because the court did not instruct the jury to begin anew and instead instructed the alternate to "'continue with deliberations with the jury'").

---

[1] Moreover, after our decision in Williams, our Supreme Court overruled an Appellate Division decision "to the extent that it generally barred trial courts from substituting a juror and directing new deliberations, by virtue of the fact that the original jury had reached an initial impasse and was charged" with the deadlocked jury instruction. Ross, 218 N.J. at 153-55.

Defendant argues Juror #11 may have expressed an opinion in then original jury on whether to have a playback. However, an original jury's opinion that a playback was needed does not deprive a seated alternate or a reconstituted jury of the ability to deliberate. See Ross, 218 N.J. at 151; Williams, 171 N.J. at 169-70. In any event, the trial court instructed the original jurors to "disregard whatever may have occurred and anything which may have been said in the jury room," and to "give no weight to any opinion expressed by Juror Number 11." Thus, there was no error.

Second, defendant has not shown that any error is "clear under current law" at the time of appellate consideration. Olano, 507 U.S. at 734. He cannot cite, and we cannot find, any New Jersey case barring courts from performing a previously-granted readback or playback merely because an alternate has been seated.

Third, defendant has not shown any error was "clearly capable of producing an unjust result." R. 2:10-2. He cannot show he was prejudiced by the single playback in open court of an audio recording of testimony the jury and the alternate had already heard. See Weston, 222 N.J. at 293-94, 300 (finding no plain error where the judge erroneously had the jury replay videos of two accusers' statements even though the jury did not request a replay, and the court erroneously allowed the jury to play the DVDs in the jury room); W.B., 205 N.J. at 623 (finding "no basis

14 <span>A-4486-15T2</span>

to reverse defendant's convictions, even if the videotape [of the defendant's confession] was not admitted into evidence, merely because the jury saw the playback of a videotaped statement that already had been played to it as part of the State's case"). Moreover, we must "assess '"the overall strength of the State's case."'" Weston, 222 N.J. at 295 (citations omitted). The State's evidence was strong: defendant was seen sitting in the driver's seat apparently putting the handgun under his seat, three officers saw the handgun under his seat, and he admitted the gun was his. Accordingly, he has not met the requirements for plain error.

### III.

Next, defendant claims his trial counsel was ineffective. "Generally, ineffective assistance of counsel claims are not entertained on direct appeal 'because such claims involve allegations and evidence that lie outside the trial record.'" State v. Allah, 170 N.J. 269, 285 (2002) (citation omitted). "However, when the trial itself provides an adequately developed record upon which to evaluate defendant's claims, appellate courts may consider the issue on direct appeal." State v. Castagna, 187 N.J. 293, 313 (2006).

To show ineffective assistance of counsel, defendant must satisfy the two-prong test set forth in Strickland v. Washington, 466 U.S. 668 (1984), and State v. Fritz, 105 N.J. 42 (1987). "The

defendant must demonstrate first that counsel's performance was deficient, i.e., that 'counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" State v. Parker, 212 N.J. 269, 279 (2009) (quoting Strickland, 466 U.S. at 687). Second, "a defendant must also establish that the ineffectiveness of his attorney prejudiced his defense. 'The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Id. at 279-80 (quoting Strickland, 466 U.S. at 694). This "is an exacting standard: '[t]he error committed must be so serious as to undermine the court's confidence in the jury's verdict or the result reached.'" State v. Allegro, 193 N.J. 352, 367 (2008) (quoting Castagna, 187 N.J. at 315).

"[C]ourts are permitted leeway to choose to examine first whether a defendant has been prejudiced, and if not, to dismiss the claim without determining whether counsel's performance was constitutionally deficient." State v. Gaitan, 209 N.J. 339, 350 (2012) (citing Strickland, 466 U.S. at 697). We do so here.

During his summation in the trial of Indictment 15-02-0231, defendant's trial counsel told the jury: "the Judge will instruct you about that, about beyond a reasonable doubt. But I like to

. . . think of it as on a scale of one to 100, beyond a reasonable doubt is, like, 75 or above.  So that's a high standard[.]"

We do not approve of such an attempt to reduce reasonable doubt to percentages.  We cannot say what if any reason counsel had for his argument.  However, even if counsel's description of reasonable doubt was deficient, defendant cannot show prejudice because the trial court properly defined reasonable doubt for the jury.

Just before opening statements, the court gave all jurors the full, model instruction on reasonable doubt.  Model Jury Charge (Criminal), "Preliminary Instructions To The Jury" (rev. May 12, 2014).  In particular, the court defined that "[a] reasonable doubt is an honest and reasonable uncertainty in your minds about the guilt of the defendants[.]"  The court explained that "proof beyond a reasonable doubt . . . leaves you firmly convinced of the defendant's guilt."  The court made clear:

> If, based on your consideration of the evidence you are firmly convinced that a defendant is guilty of the crime charged, then you must find him guilty.  If, on the other hand, you are not firmly convinced of the defendant's guilt, you must give the defendant the benefit of the doubt and find him not guilty.
>
> [(emphasis added).]

During closing arguments, defendant's counsel told the jury "[t]he Judge is going to instruct you about what reasonable doubt is." Muniz's counsel told the jury to "follow the law that the Judge gives you."

After the closing arguments, the trial court gave the jury the model instructions.[2] The court told the jurors it was instructing them on "the principles of law applicable in this case," and that:

> You must accept and apply this law for this case as I give it to you in this charge. Any ideas that you may have of what the law is or what the law should be or any statements by the attorneys as to what the law may be must be disregarded by you if they are in conflict with my charge.

[(emphasis added).]

The court then reiterated the same definition and explanations of reasonable doubt, mirroring the model charge.

The trial court also instructed the jury that "[a]rguments, statements, remarks, openings and summations of counsel" were not evidence, and that: "Whether or not the defendant has been proven guilty beyond a reasonable doubt is for you to determine based on

---

[2] Model Jury Charge (Criminal), "Criminal Final Charge Parts 1 & 2 (General Information to Credibility of Witnesses)" (rev. May 12, 2014); Model Jury Charge (Criminal), "Criminal Final Charge Part 3 (Criminal Offenses to Where More than One Defendant)" (rev. Jan. 14, 2013); Model Jury Charge (Criminal), "Criminal Final Charge Part 4 (Deliberations to Jury Questions)" (rev. Jan. 14, 2013).

all the evidence presented during the trial. Any comments by counsel are not controlling." The judge repeatedly instructed the jurors that "You must accept the law as given to you by me"; that they must rule "based on the law as I will give it to you"; and that in deliberating "[y]ou are to apply the law as I have instructed you." The court also gave the jury written copies of these instructions.

The trial court's preliminary instructions and final charge both accurately defined reasonable doubt. State v. Wakefield, 190 N.J. 397, 469-70 (2007). Moreover, the court repeatedly told the jury to disregard "any statements by the attorneys as to what the law may be must be . . . if they are in conflict with [the] charge." See State v. Lester, 271 N.J. Super. 289, 292 (App. Div. 1994). Therefore, we must "presume the jury followed the court's instructions." State v. Smith, 212 N.J. 365, 409 (2012) (presuming the jury followed the trial court's instruction "that the remarks made by the attorneys in their summations were not evidence").

Applying that presumption, we have rejected a similar claim in State v. Powell, 294 N.J. Super. 557 (App. Div. 1996). There, in both opening statements and in summation, co-defendant's attorney told the jury the standard of proof beyond a reasonable doubt was "not one hundred percent . . . but it's somewhere between seventy and one hundred percent, somewhere." Id. at 566. We

19

rejected the defendant's claim, even though the attorney during opening statement and in summation "clearly misstated the concept of reasonable doubt, [because] the judge told the jury in no uncertain terms that it should follow his instructions, not those given by the attorneys. The judge's definition of reasonable doubt was accurate. We presume that the jury followed the judge's instructions." Ibid.

Defendant claims the prosecutor told the jury defendant's trial counsel properly defined reasonable doubt. However, the prosecutor commented only that trial counsel in closing "said maybe beyond a reasonable doubt is about 75 percent, ladies and gentlemen. Now think about that number, 75 percent. The State in this case proved these elements beyond a reasonable doubt, almost to a near certainty . . . . certainly more than [trial counsel] is advocating for you to find." The prosecutor's comments, while regrettable, ultimately asserted the State's proof met the proper standard, approaching "yet not necessarily to an absolute certainty." Model Jury Charge (Criminal), "Reasonable Doubt" (rev. Feb. 24, 1997). In any event, the trial court told the jury to follow its correct instructions despite any comments by the attorneys, which included the prosecutor.

As the jury was properly instructed on reasonable doubt, defendant's claim of structural error is inapposite. Structural

error exists "only in a very limited class of cases." State v. Camacho, 218 N.J. 533, 549 (2014) (quoting Johnson, 520 U.S. at 468). Such extreme cases can include "defective" reasonable-doubt instructions, but do not include improper arguments by counsel, which are not reversible error if not prejudicial. Id. at 547-50. Because defendant has not shown prejudice, his ineffectiveness claim fails.

IV.

Defendant's sentencing claims raise issues of statutory interpretation involving a recently-enacted offense, N.J.S.A. 2C:39-5(j). "'[B]ecause statutory interpretation involves the examination of legal issues,'" we apply "'a de novo standard of review.'" State v. Nance, 228 N.J. 378, 393 (2017) (citation omitted). We must hew to that standard of review.

> A court's responsibility "is to give effect to the intent of the Legislature." To do so, we start with the plain language of the statute. If it clearly reveals the Legislature's intent, the inquiry is over. If a law is ambiguous, we may consider extrinsic sources including legislative history. We also look to extrinsic aids if a literal reading of the law would lead to absurd results.
>
> [State v. Harper, 229 N.J. 228, 237 (2017) (citations omitted).]

A.

Defendant's pro se brief argues that he could not be sentenced as a first-degree offender under N.J.S.A. 2C:39-5(j). However, defendant was convicted of the second-degree offense of knowingly possessing a handgun without first having obtained a permit, in violation of subsection (b) of N.J.S.A. 2C:39-5. He was also convicted under N.J.S.A. 2C:39-5(j), which provides: "A violation of subsection a., b., c. or f. of this section by a person who has a prior conviction of any of the crimes enumerated in [NERA] is a first degree crime." Ibid. Defendant had at least two 1998 convictions for NERA crimes: aggravated assault with a firearm, N.J.S.A. 2C:12-1(b)(4); and aggravated assault with serious bodily injury, N.J.S.A. 2C:12-1(b)(1). See N.J.S.A. 2C:43-7.2(d)(4). Therefore, under the plain statutory language, he could be sentenced under N.J.S.A. 2C:39-5(j) as a first-degree offender.

Defendant contends neither of his 1998 offenses should count because N.J.S.A. 2C:39-5(j) like other statutes should preclude use of prior convictions more than ten years old. He cites the "Three Strikes" section, N.J.S.A. 2C:43-7.1, which provides:

> The provisions of this section shall not apply . . . unless the crime for which the defendant is being sentenced was committed either within 10 years of the date of the defendant's last release from confinement for commission of any crime or within 10 years of the date of the commission of the most recent of the crimes

22

> for which the defendant has a prior conviction.
>
> [N.J.S.A. 2C:43-7.1(c).]

He also cites the "persistent offender" subsection, N.J.S.A. 2C:44-3(a), which allows an extended term if the defendant was "convicted on at least two separate occasions of two crimes . . . if the latest in time of these crimes or the date of the defendant's last release from confinement, whichever is later, is within 10 years of the date of the crime for which the defendant is being sentenced." <u>Ibid.</u>

However, N.J.S.A. 2C:39-5(j) contains no such language imposing a ten-year limitation. "[A] court may not rewrite a statute or add language that the Legislature omitted." <u>State v. Munafo</u>, 222 N.J. 480, 488 (2015). N.J.S.A. 2C:39-5(j) is not ambiguous, so the rule of lenity is inapplicable. Nor is it absurd to have a recidivist statute without such a ten-year limitation.

Defendant argues N.J.S.A. 2C:39-5(j) and the statutes he cites are "in pari materia" and thus "'construed together as a "unitary and harmonious whole."'" <u>Marino v. Marino</u>, 200 N.J. 315, 330 (2009) (citation omitted). "Resort to this maxim . . . is helpful when the Legislature's intent is unclear," but N.J.S.A. 2C:39-5(j) is clear. <u>See</u> <u>ibid.</u> Moreover, the three-strikes and persistent-offender provisions defendant cites are not in pari

materia with N.J.S.A. 2C:39-5(j)'s firearm upgrade; they were enacted many years before and do not "'relate to the same person or thing, to the same class of persons or things, or have the same purpose or object.'" See ibid. (citation omitted). "[T]he language used in each of the sections, the selection of different words, and the Legislature's expression of a different preference in one section than in the other[s] makes plain that they are not designed to serve a common purpose." See id. at 331. We may not "apply[] this maxim of statutory construction . . . [to] inappropriately import concepts from one statutory provision into a separate provision with a different objective or intent." Ibid.

## B.

Defendant's counseled brief argues the trial court erred in imposing an extended-term thirty-year prison sentence for defendant's conviction under N.J.S.A. 2C:39-5(j). The court based the extended term on N.J.S.A. 2C:43-6(c) and N.J.S.A. 2C:44-3 as amended in the Graves Act, L. 1981, c. 31, and thereafter.

N.J.S.A. 2C:43-6(c) provides for imprisonment and a mandatory minimum term for defendants who commit enumerated firearm crimes:

> [a] person who has been convicted under subsection b. or d. of N.J.S.2C:39-3, subsection a. of N.J.S.2C:39-4, subsection a. of section 1 of P.L.1998, c.26 (C.2C:39-4.1), subsection a., b., c., or f. of N.J.S.2C:39-5, subsection a. or paragraph (2) or (3) of subsection b. of section 6 of P.L.1979, c.179

24

> (C.2C:39-7), or subsection a., b., e. or g.
> of N.J.S.2C:39-9, or of a crime under any of
> the following sections: 2C:11-3, 2C:11-4,
> 2C:12-1b., 2C:13-1, 2C:14-2a., 2C:14-3a.,
> 2C:15-1, 2C:18-2, 2C:29-5[.]
>
> [N.J.S.A. 2C:43-6(c) (emphasis added).]

N.J.S.A. 2C:43-6(c) requires an extended-term sentence for an enumerated firearm crime if the defendant was previously convicted of an offense involving use or possession of a firearm:

> A person who has been convicted of an offense
> enumerated by this subsection and who used or
> possessed a firearm during its commission,
> attempted commission or flight therefrom and
> who has been previously convicted of an
> offense involving the use or possession of a
> firearm as defined in 2C:44-3d., shall be
> sentenced by the court to an extended term as
> authorized by 2C:43-7c., notwithstanding that
> extended terms are ordinarily discretionary
> with the court.
>
> [N.J.S.A. 2C:43-6(c) (emphasis added).]

N.J.S.A. 2C:44-3(d) defines such a "[s]econd offender with a firearm":

> [t]he defendant is at least 18 years of age
> and has been previously convicted of any of
> the following crimes: 2C:11-3, 2C:11-4, 2C:12-
> 1b., 2C:13-1, 2C:14-2a., 2C:14-3a., 2C:15-1,
> 2C:18-2, 2C:29-5, 2C:39-4a., or has been
> previously convicted of an offense under Title
> 2A of the New Jersey Statutes or under any
> statute of the United States or any other
> state which is substantially equivalent to the
> offenses enumerated in this subsection and he
> used or possessed a firearm, as defined in
> 2C:39-1f., in the course of committing or

> attempting to commit any of these crimes,
> including the immediate flight therefrom.

[N.J.S.A. 2C:44-3(d) (emphasis added).]

N.J.S.A. 2C:44-3 mandates a defendant covered by N.J.S.A. 2C:44-3(d) must receive a mandatory extended term if he or she is being sentenced for an offense enumerated in N.J.S.A. 2C:43-6(c):

> If the grounds specified in subsection d. are found, and the person is being sentenced for commission of any of the offenses enumerated in N.J.S.2C:43-6c. or N.J.S.2C:43-6g., the court shall sentence the defendant to an extended term as required by N.J.S.2C:43-6c. or N.J.S.2C:43-6g., and application by the prosecutor shall not be required.

[N.J.S.A. 2C:44-3 (emphasis added).]

Defendant was over eighteen years old and had previously been convicted of aggravated assault with a firearm, N.J.S.A. 2C:12-1(b)(4), a qualifying prior offense under N.J.S.A. 2C:44-3(d). Thus, the trial court properly imposed a mandatory extended-term sentence for his conviction under Indictment No. 15-02-0231 for second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b), a firearm crime enumerated in N.J.S.A. 2C:43-6(c).

The trial court also imposed a mandatory extended-term sentence on his conviction under Indictment No. 16-01-0056 for N.J.S.A. 2C:39-5(j). However, N.J.S.A. 2C:43-6(c) includes

26 A-4486-15T2

"subsection a., b., c., or f. of N.J.S. 2C:39-5," but not subsection (j), among the enumerated firearm crimes.[3]

The trial court erred in imposing a mandatory extended-term sentence on a firearm crime not enumerated in N.J.S.A. 2C:43-6(c). That section clearly and unambiguously lists only "subsection a., b., c., or f. of N.J.S. 2C:39-5" among the enumerated firearm crimes eligible for such terms. Ibid. "'[I]f the meaning of the text is clear and unambiguous on its face, [we must] enforce that meaning.'" State v. Grate, 220 N.J. 317, 330 (2015) (citation omitted). "Because the Graves Act extended term sentencing provisions enumerate the crimes that trigger such sentences, and because [N.J.S.A. 2C:39-5(j)] is not so enumerated," defendant's sentence for that crime "should have been imposed without a Graves Act extended term." See State v. Livingston, 340 N.J. Super. 133, 140 (App. Div. 2001), aff'd, 172 N.J. 209, 215-16 (2002).

We similarly reversed a mandatory extended-term sentence imposed where "th[e] list of offenses eligible for a mandatory extended term [in N.J.S.A. 2C:43-6(f)] does not list the public

---

[3] N.J.S.A. 2C:39-5(j) also is not enumerated in N.J.S.A. 2C:43-6(g), which provides for imprisonment and a minimum term for "[a]ny person who has been convicted under subsection a. of N.J.S.2C:39-4 or of a crime under any of the following sections: N.J.S.2C:11-3, N.J.S.2C:11-4, N.J.S.2C:12-1b., N.J.S.2C:13-1, N.J.S.2C:14-2a., N.J.S.2C:14-3a., N.J.S.2C:15-1, N.J.S.2C:18-2, N.J.S.2C:29-5, N.J.S.2C:35-5[.]"

facility offense, N.J.S.A. 2C:35-7.1." State v. Patterson, 435 N.J. Super. 498, 516 (App. Div. 2014). Courts "cannot rewrite a criminal statute to increase sentencing penalties that do not appear clearly on the face of that statute." Ibid. (quoting State v. Gelman, 195 N.J. 475, 487 (2008)).

The trial court offered several reasons why the first-degree offense should be eligible for an extended term. First, the court stated: "even though the legislature doesn't include Section (j) in the mandatory extended term provisions of N.J.S.A. 2C:44-3, . . . it doesn't make sense that the mandatory extended term provisions should not apply." However, it was not absurd for the Legislature to impose different penalties on firearms offenders, repeat firearms offenders, and firearm offenders with serious prior crimes. The Legislature penalized the possession of certain firearms as second- or third-degree offenses in N.J.S.A. 2C:39-5(a), (b), (c), and (f). By including those offenses in N.J.S.A. 2C:43-6(c)'s list, the Legislature required an extended-term sentence if the defendant had previously committed certain offenses while using or possessing a firearm. The Legislature enacted N.J.S.A. 2C:39-5(j) to increase those offenses to a first-degree offense if the defendant previously committed one of the serious crimes subject to NERA even if a firearm was not involved.

The Legislature could rationally believe that creating a first-degree offense provided sufficient punishment.

Patterson faced a similar situation where the Legislature created an increased-grade offense and did not include it in the list of offenses eligible for a mandatory extended term which included its predicate offense. The Legislature penalized drug distribution in N.J.S.A. 2C:35-5. The Legislature included N.J.S.A. 2C:35-5 in N.J.S.A. 2C:43-6(f)'s list of offenses requiring an extended-term sentence if the defendant previously committed certain drug offenses. The Legislature later created a higher-grade offense in N.J.S.A. 2C:35-7.1 for a violation of N.J.S.A. 2C:35-5 if the defendant committed it within 500 feet of a public facility. We held the increased-grade crime "cannot be subject to a mandatory extended term under [N.J.S.A. 2C:43-6(f)] as currently written." Patterson, 435 N.J. Super. at 516.

Second, the trial court saw no reason for N.J.S.A. 2C:43-6(c) to differentiate N.J.S.A. 2C:39-5(j) from "subsection a., b., c., or f. of" N.J.S.A. 2C:39-5, because those subsections "merely identify the particular type of weapon that is involved," namely machine guns, handguns, shotguns, rifles and shotguns, and assault firearms, respectively. However, that is a valid reason to differentiate N.J.S.A. 2C:39-5(j), because it does not penalize the possession of a particular type of firearm, but merely creates

29

a higher-graded offense penalizing such possession if the defendant committed certain prior offenses.

Third, the trial court could not "fathom a scenario where the legislat[ors] intended to omit a firearms offense from the Graves Act, especially after they enhanced the penalty and applied it to more crimes." However, N.J.S.A. 2C:43-6(c) does not include all firearm offenses, as it also omits N.J.S.A. 2C:39-5(e). Moreover, examination of the act and its legislative history shows that the Legislature created N.J.S.A. 2C:39-5(j), and simultaneously revised N.J.S.A. 2C:43-6(c)'s list of crimes subject to extended terms, but did not add N.J.S.A. 2C:39-5(j) to that list.

N.J.S.A. 2C:39-5(j) was enacted on August 8, 2013, by L. 2013, c. 113, § 1. That 2013 act also amended the enumerated crimes in N.J.S.A. 2C:43-6(c): "A person who has been convicted under subsection b. or d. of N.J.S.2C:39-3, subsection a. of N.J.S.2C:39-4, subsection a. of section 1 of P.L.1998, c.26 (C.2C:39-4.1), subsection a., b., [or] c., or f. of N.J.S.2C:39-5[.]" L. 2013, c. 113, § 2 (advance law indicating additions and [deletions]). The act thus added N.J.S.A. 2C:39-5(f), an assault firearm offense, to the list of enumerated crimes, but did not add the newly-enacted N.J.S.A. 2C:39-5(j) to that list. We read the Legislature's choice to add only N.J.S.A. 2C:39-5(f) to N.J.S.A. 2C:43-6(c) "as proof that the Legislature intended to specify

offenses subject to the mandatory extended term, rather than leaving to the courts to draw such inferences."  See Patterson, 435 N.J. Super. at 517.

The legislative history discussed the enactment of N.J.S.A. 2C:39-5(j) and the addition of N.J.S.A. 2C:39-5(f) to N.J.S.A. 2C:43-6(c), with no suggestion N.J.S.A. 2C:39-5(j) was also added. The statements appended to the bill throughout its consideration stated that the bill "upgrades the crime of unlawful possession of a firearm to a first degree crime in certain circumstances and amends various penalty provisions under the Graves Act."  Sponsors' Statement Appended to S. 2804 8 (May 13, 2013); S. L. & Pub. Safety Comm. Statement to S. 2804 1 (May 21, 2013); Assemb. L. & Pub. Safety Comm. Statement to S. 2804 1 (June 6, 2013).  The statements first explained the enactment of N.J.S.A. 2C:39-5(j):

> The provisions of the bill make it a crime of the first degree for a person to unlawfully possess a machine gun, handgun, rifle or shotgun, or an assault firearm following a conviction for a crime enumerated in subsection d. of section 2 of P.L.1997, c. 117 (C.2C:43-7.1) (the No Early Release Act.) Under current law, violations of these provisions are either a second degree offense, in the case of machine guns, handguns and assault firearms, or a third degree offense, in the case of rifles and shotguns.
>
> [Ibid.]

The statements also stated "the bill adds the unlawful possession of an assault firearm to the list of crimes for which Graves Act sentencing applies." Ibid.[4] The legislative history makes no mention of including N.J.S.A. 2C:39-5(j) as an enumerated offense under N.J.S.A. 2C:43-6(c).

Fourth, the trial court assumed the Legislature required an extended term for N.J.S.A. 2C:39-5(j) "in response to the scourge of . . . violence which plagues our country." However, the legislative history made no mention of that scourge. In any event, the Legislature's addition of N.J.S.A. 2C:39-5(j) was a substantial step to combatting gun possession by defendants who have committed serious crimes by making it a first-degree offense, and thus increasing the range of imprisonment to ten-to-twenty years from the third-degree offenses' three-to-five years and the second-degree offenses' five-to-ten years. Compare N.J.S.A. 2C:39-5(j) with N.J.S.A. 2C:39-5(a), (b), (c) and (f); see N.J.S.A. 2C:43-6(a).

The trial court's reading authorizing an extended term for an offense under N.J.S.A. 2C:39-5(j) would increase the range of imprisonment to twenty-years-to-life. See N.J.S.A. 2C:43-7(a)(3),

_____

[4] Identical language appeared in the statements accompanying the identical Assembly bill. Sponsors' Statement Appended to A. 4152 8 (June 6, 2013); Assemb. L. & Pub. Safety Comm. Statement to A. 4152 1 (June 6, 2013).

(c). Nothing in the act or its legislative history even hints the Legislature intended such a dramatic increase.

Even "if there were ambiguity in the statutory provisions that we have analyzed, we would be guided by the doctrine of lenity because we are construing a criminal statute." State v. Rangel, 213 N.J. 500, 515 (2013). "[T]he rule of lenity derives from the principle that '[n]o one shall be punished for a crime unless both that crime and its punishment are [not] clearly set forth in positive law.'" State v. Regis, 208 N.J. 439, 451-52 (2011) (citation omitted). "That doctrine 'holds that when interpreting a criminal statute, ambiguities that cannot be resolved by either the statute's text or extrinsic aids must be resolved in favor of the defendant.'" Rangel, 213 N.J. at 515 (citation omitted). "Thus, even if [N.J.S.A. 2C:43-6(c)'s] text was ambiguous, the rule of lenity would require us to interpret [it] as inapplicable to [N.J.S.A. 2C:39-5(j)], given the absence of any contrary legislative history." See Patterson, 435 N.J. Super. at 518. Thus, we reject the trial court's reasons.

The State contends the trial court's interpretation effectuates the goal of the Graves Act, because "the Graves Act approach is deterrence through the promise of imprisonment." State v. Des Marets, 92 N.J. 62, 71 (1983). However, when the Graves Act was passed, N.J.S.A. 2C:43-6(c) enumerated only one firearm

A-4486-15T2

offense, N.J.S.A. 2C:39-4(a). <u>L.</u> 1981, <u>c.</u> 31, § 1. The Legislature subsequently amended N.J.S.A. 2C:43-6(c) to add particular firearm offenses as enumerated offenses. <u>L.</u> 2007, <u>c.</u> 341 § 5; <u>L.</u> 2013, <u>c.</u> 113, § 2. Moreover, the issue before us is not the intent of the 1981 Graves Act, but of the 2013 act. That act increased deterrence and imprisonment by creating N.J.S.A. 2C:39-5(j)'s first-degree offense, but pointedly did not add it to N.J.S.A. 2C:43-6(c)'s list.

The State says it strains credulity that the Legislature attached different punishments for unlawful possession of a firearm by a recidivist depending on whether the prior conviction was for unlawful possession of a firearm or a NERA crime. However, the issue here is not the Legislature's rationales for (1) requiring an extended term under N.J.S.A. 2C:43-6(c) where the prior conviction involved a firearm, and (2) creating a first-degree offense in N.J.S.A. 2C:39-5(j) where the prior conviction was a NERA crime. Rather, the issue is whether the Legislature intended to <u>both</u> create a new first-degree offense <u>and</u> require an extended term for that offense.

The State also cites Judge Learned Hand's comment that "[t]here is no surer way to misread any document than to read it literally." <u>Guiseppi v. Walling</u>, 144 F.2d 608, 624 (2d Cir. 1944) (Hand, J., concurring), <u>aff'd on other grounds sub nom.</u>, <u>Gemsco,</u>

<u>Inc. v. Walling</u>, 324 U.S. 244 (1945). However, Judge Hand's witticism must be viewed in context, lest it be misused to disregard the Legislature's language and intent. Judge Hand made clear that the legislators' "words are by far the most decisive evidence of what they would have done," and that he "should have had the utmost compunction in disregarding the explicit language [of the statute], were it not for its legislative history." <u>Guiseppi</u>, 144 F.2d at 623-24. Here, there is no legislative history justifying the reading of the trial court and the State, which contradicts the plain language of the act.

Finally, the State complains that applying N.J.S.A. 2C:43-6(c) as written unduly constrains the court's sentencing range. However, the ten-to-twenty-year sentencing range provided by N.J.S.A. 2C:39-5(j) for a recidivist's possession of a firearm is exceeded by only a few, very serious offenses. In any event, such a complaint should be addressed to the Legislature.

Accordingly, we remand to the trial court with instructions to vacate defendant's sentences under both indictments and resentence without imposing an extended term on his conviction under N.J.S.A. 2C:39-5(j).[5]

---

[5] "A defendant may be sentenced to multiple mandatory extended terms in the same proceeding," but "N.J.S.A. 2C:44-5(a)(2) bars the imposition of a discretionary extended term when . . . the

V.

The judgments of conviction give defendant 109 days of jail credit for August 16 to October 14, 2014, and February 12 to March 31, 2016. However, the trial court at sentencing awarded an additional forty-two days of jail credit from March 31 to the May 13, 2016 sentencing. Moreover, defendant asked for additional jail credit for his custody on other charges from January 3 to June 19, 2015. The State now agrees defendant should receive credit for those 168 days. The court shall ensure those additional amounts of jail credit are reflected on the new judgments.

The parties' remaining arguments lack sufficient merit to warrant discussion. R. 2-11(e)(2).

Defendant's convictions are affirmed, and the case is remanded to vacate his sentences and resentence him. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

trial court is obliged to impose a mandatory extended term on another offense in the same proceeding." State v. Robinson, 217 N.J. 594, 597-98 (2014).

A-4486-15T2